# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

MEGAN BARRY, as parent and next friend of A.P., a minor child,

        Plaintiff,

vs.

CEDAR RAPIDS COMMUNITY SCHOOL DISTRICT, GARY HATFIELD and CECELIA LANE,

        Defendants.

No. C17-120-LTS

**MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter is before me on a motion (Doc. No. 35) for summary judgment filed by defendants Cedar Rapids Community School District (the District), Gary Hatfield and Cecelia Lane. Plaintiff Megan Barry, as parent and next friend of A.P., a minor child, has filed a resistance (Doc. No. 47)[1] and defendants have replied (Doc. No. 52). Oral argument is not necessary. *See* N.D. Iowa L.R. 7(c).

## II. PROCEDURAL BACKGROUND

The complaint (Doc. No. 1), which was filed October 27, 2017, asserts several claims under federal and Iowa law against the District and the individual defendants. The claims arise from an incident on March 21, 2017, when A.P., a child with cerebral palsy who uses a wheelchair, was allegedly injured by a slap to the face from District employee Lane as he was exiting a school bus. The complaint contains the following claims:

---

[1] Barry's resistance was filed twice (Doc. No. 47 and attachments Doc. No. 50 and attachments). The filings appear to be identical.

| Count 1: | Excessive Use of Force (Fourth Amendment, 42 U.S.C. § 1983) against Lane[2] |
| Count 2: | Discrimination (Americans with Disabilities Act, 42 U.S.C. § 12132) against the District |
| Count 3: | Discrimination (Rehabilitation Act, 29 U.S.C. § 504) against the District |
| Count 4: | Negligence (Iowa Law) against all defendants |
| Count 5: | Battery (Iowa Law) against Lane |
| Count 6: | Conspiracy to Violate Constitutional Rights (42 U.S.C. § 1985) against all defendants |

*See* Doc. No. 1. Defendants filed an answer (Doc. No. 10) on November 16, 2017, denying liability and raising various affirmative defenses. They filed their motion for summary judgment on November 19, 2018. Trial is scheduled to begin August 12, 2019.

## III.   *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*,

---

[2] The heading for Count 1 states that it is made solely against defendant Lane, Doc. No. 1 at 1 ("Plaintiff A.P. vs. Lane"). However, the allegations in Count 1 address conduct by all defendants. *See id.* at ¶¶ 33, 35 ("*Defendants* violated Plaintiff A.P.'s rights . . . by actions, including but not limited to, acting with deliberate indifference to the risk of harm to A.P. from LANE and failing to adequately train and supervise the faculty and staff in the use of force and restraint when seizing special education students with disabilities. . . . Defendants' actions, as described above, were objectively unreasonable, willful and wanton, in light of the facts and circumstances." (emphasis added)). While these allegations hint at a potential claim against the District for maintaining an unconstitutional custom or practice under *Monell v. Dept. of Soc. Srvs.*, 436 U.S. 658 (1978), the complaint does not expressly assert such a claim and neither party has addressed it in their briefing. Thus, I will treat Count 1 in accordance with its label as being a claim against Lane for excessive use of force.

477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party

fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

## IV.    RELEVANT FACTS

Except as otherwise noted, the parties do not dispute the following facts:

### A.    The Parties

A.P., a minor, has been diagnosed with cerebral palsy, hydrocephalus, epilepsy, a cortical vision impairment, sensory processing disorder and behavior disorder. Doc. No. 42-3 at 15, 18. As a result of cerebral palsy, A.P. has limited use of his limbs and uses a wheelchair. *Id.* He receives constant injections of Baclofen through a pump. *Id.* at 17. Megan Barry is A.P.'s mother. Doc. No. 1 at ¶ 5.

The District is a public entity incorporated under Iowa law as a school district. Doc. *Id.* at ¶ 7. The District's schools include Taft Middle School, where A.P. is a student. Gary Hatfield is the Principal at Taft and was a witness to the incident. *Id.* at ¶ 8. Cecelia Lane was a special education bus driver for the District during the 2016-17 school year and is alleged to have slapped A.P. *Id.* at ¶ 9.

***B.   A.P.'s Education and Behavioral Plans at School***

A.P. had an Individualized Education Plan (IEP) in place concerning special education services.  *See* Doc. No. 42-4 a 14-25, Doc. No. 42-5 at 1-10.  Prior to the alleged incident, the IEP was most recently updated on January 30, 2017.  Subsequent progress reports to the IEP indicate that A.P. was making progress in reading, math and writing, and that his behavior had been steadily improving.  A.P.'s IEP also includes specialized transportation to and from school.  Doc. No, 42-5 at 5.

A.P. also had a Functional Behavior Assessment (FBA) and a Behavior Intervention Plan (BIP) which addressed certain aggressive behaviors (i.e., hitting, biting and spitting) and disruptive behavior (i.e., ripping items, knocking over books, yelling and being off-task).  Doc. No. 42-5 at 11-15.  During the January 30, 2017, meeting regarding A.P.'s education, the school team reported "a huge increase" in A.P.'s negative behaviors:

> [A.P.] is really struggling to be on-task and there has been an increase in the physically aggressive behavior (hitting and biting).  The surgeon and doctors have shared that this may be a side effect of his surgery (hemispherectomy).  He now has a lack of impulse control.
>
> There was some discussion about the ABC's of his behavior and not being sure what the antecedents are at this time.  The suggestion was made to make a referral to the district Challenging Behavior team.

*Id.* at 10.  During this same meeting, there was discussion of A.P. having issues with transportation to and from school:

> [A.P.] has had a few issues getting on the bus this past few weeks.  The team discussed engaging the bus driver in a token economy system with [A.P.] to help develop their relationship and to help get him on to the bus.

*Id.*

## C.    *The Incident*

In December 2016, about three months before the alleged slap, A.P. underwent a hemispherectomy to treat his epilepsy.  Doc. No. 47-3 at 15-16.  The parties agree that after the surgery, A.P.'s negative behaviors increased, apparently due to a lack of impulse control resulting from the surgery.  On December 15, 2016, Barry sent a guide titled "Education after Hemispherectomy" to Hatfield and to A.P.'s teacher, Joshua Goff.  *Id.* at 16-23.  There is no evidence to suggest that Lane received this guide, or any specific instructions regarding A.P.'s recovery.

On January 30, 2017, after the surgery but before the alleged slap, A.P.'s increased behaviors were noted in his IEP and BIP and school officials were on notice that A.P. was having issues on the school bus.  *Id.* at 26.  The school was also on notice at this time that A.P. had a new health plan to mitigate the risks of hydrocephalus following his surgery.  *Id.*  Lane was not present at that meeting and did not have any specific knowledge of A.P.'s IEP or BIP.  Doc. No. 42-7 at 10.

Barry testified to the normal procedure for getting A.P. off the bus:

> A.    The attendant would roll him to the ramp.  He would come down off the ramp when the bus driver would lower him, and then I would take him off the ramp into my home.
>
> Q.    And was it – Was the normal procedure when [A.P.] was being lowered on the ramp that the bus driver would be on one side and you would be on the other?
>
> A.    Typically, because I or my husband would go out and get him off the bus, so one of us would be right there by the ramp, yes.
>
> Q.    But was it typical for the bus driver operating the lift to be on one side and you to be on the other?
>
> A.    Or direct – or me directly in front of the ramp.  But yes, right there in that general vicinity.

Doc. No. 42-5 at 5.  Barry did not typically have to get on the bus to assist moving A.P. to the lift.  *Id.*

6

On March 21, 2017, when it was time for A.P. to get off the bus, he began yelling that he did not want to go home, locking and unlocking his wheelchair brakes, and spitting at those around him. Lane was driving the bus with A.P. that day.[3] Doc. No. 42-6 at 21, 42-7 at 10. Hatfield was on the bus, serving as A.P.'s paraprofessional and training A.P.'s new paraprofessional, Paula Kelly.[4] Doc. No. 42-6 at 15. Kayla Nichols, a paraprofessional for another student, was also on the bus, as well as Bob O'Brien, the bus attendant.

When the bus arrived at Barry's home on March 21, 2017, Barry was able to observe through the bus window that A.P. "was having a behavior." Doc. No. 42-4 at 6. After a few minutes, Hatfield asked Barry to come onto the bus to assist with off-loading A.P. *Id.* Barry came onto the bus to help Hatfield and O'Brien. She described the scene as follows:

> Q. And when you got onto the bus and went up to – did you go up to [A.P.]?
>
> A. Yes.
>
> Q. Was the seatbelt or strap that held the seatbelt on to the bus still connected?
>
> A. I don't recall because I was helping to block while they unbuckled everything, while I believe Mr. Hatfield and Bob were both

---

[3] Although Lane was off work during the time A.P. was recovering from his surgery and had an increase in his behaviors, she testified that she had driven the bus for him the previous semester and the previous year and had never before observed behaviors like those on the date in question. Doc. No. 42-7 at 10. However, she also testified that on one occasion she made the decision to not allow A.P. on the bus when "it took two people to bring him out, they were each holding his hands – they each had ahold of his hand, and the other hand – the other hand was on the wheelchair handles wheeling him out . . . [a]nd he spit at me when I called his name." *Id.* at 11. Lane clarified that there were occasional issues loading or unloading A.P. from the bus, but that he was generally a well-behaved passenger. *Id.* at 12.

[4] Pursuant to A.P.'s IEP, he was to have a dedicated paraprofessional with him on the bus. However, A.P.'s designated paraprofessional left the job without notice and Hatfield filled in to assist A.P. Doc. No. 42-6 at 10.

> unbuckling things. I was tending to [A.P.'s] behaviors so that they didn't get injured.
>
> Q. Okay. And what were the behaviors that he was exhibiting while you were on the bus?
>
> A. He was yelling, he was attempting to hit, he was spitting, and he was attempting to bite. And I – He was also attempting to kick, because when he's trying to hit, he's also always typically trying to kick.
>
> \*\*\*
>
> Q. So did you stand in the aisle?
>
> A. I stood in the aisle and directly in front of his chair, and then we walked him to the ramp. So I was all over that area.
>
> Q. And do you recall there being on the other side or the right ide of the bus a student that had a tracheotomy?
>
> A. I don't recall the trach, but I know there was a student because I was helping to hold his left hand down and block spit so that his other student – and I believe there was an adult over there too – so that they didn't get hit with his spit or aggressions.

*Id.* at 7. Barry continued to hold A.P.'s hands and block him from spitting others on the bus as O'Brien rolled A.P.'s wheelchair to the lift. *Id.*

Barry testified that, as she exited the bus using the pedestrian stairs at the front of the bus, she could hear Lane telling A.P. to "stop being naughty" and that "he needed to be good on the bus." *Id.* at 8. Barry walked over to the lift, where she stood on the right side. Hatfield was on the bus behind the lift, and Lane was to the left of the lift to operate the lift controls. *Id.* at 8. A.P. continued his behaviors on the lift, unlocking his wheelchair brakes and attempting to kick those near him. *Id.* at 9. Barry attempted to redirect A.P. using the words "calm hands, calm feet." *Id.* Barry was also attempting to re-direct Lane, who she contends was yelling at A.P. in a way that would cause him to escalate his behaviors. *Id.* As the lift lowered, Barry testified that A.P. looked at her, spit at her, then turned to Lane and smiled. *Id.* Barry then saw Lane reach up and slap

A.P., swinging her hand and stepping into it.  *Id.* at 10.  Once A.P. was removed from the lift, Barry called Hatfield off of the bus and called the Cedar Rapids Police Department.  *Id.*

Other witnesses described the event differently.  Hatfield, who was standing on the bus behind the lift, testified that Lane was not yelling at A.P., but rather asking him to stop messing with his brakes as the lift moved because it was dangerous.  Doc. No. 42-6 at 16.  He testified that he saw A.P. spit at Barry clearly, because A.P. had been eating M&M candies and there was chocolate in the spittle.  *Id.*  When A.P. turned towards Lane, Barry stated that it looked like he was winding up to spit again.  Regarding the slap itself, Hatfield testified:

> A.  In this particular case by what I saw, not by what I thought, it looked to be a reaction to [A.P.'s] motion towards her. And reactions like that are kind of involuntary.  I think we've all been in a case where like we're driving down the road and a bird flies at our windshield. We jerk even though we know that bird's not going to his us.  It's just an involuntary reaction that happens.  And I think that's what this was.  From what I saw, he jerked towards her, looked like he was going to spit at her, the hand came up.

> Q.  And what happened after that?

> A.  Well, from what I saw from my vantage point, and which I thought was a pretty good vantage point, by the way, she was holding the remote in this hand (indicating).

> Q.  Her right hand?

> A.  In her right hand.  And I know some of this contradicts with some things she said, but I got to tell you what I saw.  She kind of had it in both hands and was adjusting things as she passed it back and forth.  She had it in this hand (indicating) and this hand (indicating) was close.  As he started to spit at her, this hand (indicating) turned around, it started from about her chin level, and she leaned back as, you know, he lunged towards her.  And I felt like her hand moved forward slightly but not a lot.  A lot of that motion was, you know, her going backwards.

*Id.* at 12. Hatfield agreed that "the contact was with her left hand to his face." *Id.* He described it as a "defensive act" that "came from chest out as a block." *Id.* at 18.

Lane agreed that she was standing to the left of the lift while A.P. was being lowered down from the bus. She explained that she operates the lift controls with both her left and right hands – she may grab the controls with her right hand, but while a child is on the lift she operates the controls with her left hand and holds onto part of the lift with her right hand. Doc. No. 42-8 at 4. She described the incident as follows:

Q.     What process – What step in the process of unloading [A.P.] were you in at the time that the physical contact occurred?

A.     The lift was on its way down.

Q.     Okay. So he's on the lift – The wheelchair is totally on the lift?

A.     Correct.

Q.     Who is behind the lift – or behind the wheelchair? Excuse me.

A.     You mean on the bus?

Q.     Yes.

A.     I – I think Gary [Hatfield] was there. I didn't see him though. I didn't know that anyone was there at that point.

Q.     Was Bob O'Brien there too?

A.     No.

Q.     He was somewhere else?

A.     I – I am assuming. I didn't see him.

Q.     And where was Megan at the time?

A.     She was on the ground to the – to the left of the lift.

***

Q.     Okay. So it's about a 3 foot drop from the top point to getting to the ground?

A.      Pretty close.

Q.      And he would have been about midpoint of that or about a foot and a half below the top – below the floor of the bus and about a foot and a half above the ground when the incident occurred?

A.      Could have been.

                                            ***

Q.      And he had tried to kick you earlier, right?

A.      Correct.

Q.      And you yelled at him about that?

A.      I didn't yell.

Q.      Well, you did tell us earlier you raised your voice.

A.      I did raise my voice.

Q.      Okay, so you're making a distinction between yelling and raising your voice?

A.      Um-hm, yes.

                                            ***

Q.      And if I understand correctly, your testimony is that you simply put your right hand up to block the spit, you made no effort to step towards [A.P.]; is that right?

A.      No, I did not.  I was at the limit by the lift.  There was no stepping into anything.

Q.      So you were already as close enough – You were already close enough to the lift, you couldn't have taken a step?

A.      No.

Q.      Let's avoid the double negative there and tell me how close you were to the –

A.      Inches.

Q. All right. And you not only couldn't take a step towards him at that time, you did not extend your right arm in any motion whatsoever?

A. No.

Q. And it was – All of the force involved in the contact came from his head coming towards your stationary hand?

A. His body. He lunged with his body sideways and down at me. I am assuming to spit. I don't know.

***

Q. All right. So – I appreciate your clarifications that, you know, the contact was more with his neck, but it was all – and it was from his body lunging towards you. But all of the force involved in whatever contact there was came from him and none from you?

A. Not that I am aware. He came very quickly, and it scared me because that lift was moving. And we have talked about that, him and I, about staying quiet on the lift and not moving arms, legs or body. And he would always tell me I'm doing it right, I'm doing it right. And I would compliment him and tell him yes. But no, he lunged sideways, I'm assuming to spit.

*Id.* at 5-8.

O'Brien testified that he saw portions of the incident through the bus window. He saw Lane's right hand come up in front of her face and he saw A.P. preparing to spit, but he did not see any contact between Lane's hand and A.P.'s face. Doc. No. 42-9 at 5. Kelly was also able to observe parts of the incident from the bus. She saw A.P. spit at Barry and observed that there was chocolate in the spittle. *Id.* at 8. She then saw A.P. turn to Lane, who appeared to be aggravated. *Id.* She saw Lane put up her right hand, palm out, and she testified that she could hear A.P. make contact with Lane's hand. *Id.* However, she testified that Lane did not move her hand towards A.P.'s face. *Id.* Finally, Nichols saw Lane attempt to block spit, most likely with her right hand, but did not see any contact between Lane's hand and A.P.'s face. *Id.* at 14.

12

*D.     The Aftermath*

It appears undisputed that, after the alleged slap, A.P. had a red mark on his face which dissipated in less than 24 hours.  Barry alleges that A.P. has suffered increased headaches, seizures and vomiting since the accident, and he has had subsequent surgery to place a shunt to drain fluid from near his brain.[5]  Doc. No. 1 at ¶¶ 22-24.  A.P. did well in school during the 2017-18 school year and advanced his educational goals during the year-end IEP meeting.  Doc. No. 42-4 at 12.

*1.     Investigation*

Immediately after the incident, Barry and Hatfield were interviewed by the police. *Id.* at 11, Doc. No. 42-6 at 22.  Lane was interviewed by phone the next morning.  Doc. No. 42-8 at 9.  There appears to have been no further police investigation and no criminal charges were filed.

Hatfield testified that on the day of the incident, he asked the adults on the bus – Lane, Kelly, O'Brien and Nichols – to write a report stating what they observed.  Doc. No. 42-7 at 4.  Hatfield then contacted Sue Wilbur, Sheila Lehman and Dawn Embretson to report the incident.  Doc. No. 42-9 at 19.  Wilbur forwarded this report to Charles McDonnell and Valerie Dolezal requesting a "level-one investigation."[6]  Meanwhile, Lane and O'Brien returned their reports to their supervisor in the bus department, Denny Schreckengast.  *Id.* at 1-3, Doc. No. 42-8 at 10-11.  Lane's and O'Brien's reports have not been located.  Similarly, although there was a recording device on the bus, it appears that it was either not working at the time of the incident or the recording was not preserved.

---

[5] The precise nature and extent of A.P.'s injuries are not at issue for purposes of the present motion for summary judgment.

[6] The term "level-one investigation" derives from the Iowa Department of Education's regulations concerning the investigation of abuse of students by school employees.  *See* Iowa Admin. Code ch. 281-102.

Also on March 21, 2017, Hatfield and Wilbur texted regarding whether a level-one investigation was necessary. Doc. No. 47-3 at 31-32. Wilbur asked whether there "was a mark" on A.P., and Gary responded with a picture showing a slight red mark. *Id.* at 31. On March 22, 2017, the day after the incident, Hatfield contacted Barry to arrange alternate transportation as she had requested that Lane no longer drive A.P. to and from school. *Id.* at 30. Hatfield arranged for "Special K" to provide transportation services and explained that both a paraprofessional and Mr. Hatfield would ride with A.P. until the new paraprofessional (Kelly) finished training. *Id.* The same day, Hatfield and Wilbur in a text conversation noted that the mark was gone:

> [Wilbur]:     Hi [Hatfield]. Does he still have a mark today?
>
> [Hatfield]:   I didn't look closely but I think no. I'll have his teacher check.
>
> [Wilbur]:     If no mark today then no need for level one.
>
> [Hatfield]:   No mark but should we do a level 1 anyway[?]
>
> [Wilbur]:     [Dolezal] says no. Mark has to be there 24 hours later.

*Id.* at 32. Hatfield also informed Wilbur that Barry's version of the events was different from his and Lane's. *Id.*

On March 23, 2017, Barry emailed Hatfield stating that A.P. would not eat anything the previous night, that he said his head hurt, and that he had a vomiting episode. *Id.* at 34. Barry advised that she would be calling the neurosurgeon with an update on A.P.'s condition, as she was worried that head trauma could cause issues after his surgery. *Id.* Hatfield responded that they would keep a close eye on A.P. and let her know if anything happened. *Id.* Also on March 23, 2017, at 8:46 a.m., Hatfield emailed the group of supervisors currently involved suggesting that they have a meeting to discuss the incident "to make sure we are investigating and reacting properly." *Id.* at 37. Lehman responded to Hatfield's email at 10:14 a.m.:

> I checked with [Dolezal] and [Wilbur], and they confirmed that this does not meet the criteria of a Level One investigation, so Val is no longer involved. Sue has obtained statements from you, the driver, and the bus attendant, and they all match, so there is no rationale for continued

14

investigation. You are right that you should not be the lead on any of the investigation, but I don't believe there will be anything further. Denny has spoken with the driver about the incident and Special Services Staff (Dawn and Wendy) have recently provided behavior training to bus staff, so that piece is covered. An alternate route has been established for the student, so we feel we've been responsive regarding this incident. I'm aware the mother may have a difference of opinion about this, but it's up to her if she wants to pursue further action on her own.

    If anyone else comes to a different conclusion or has further information, please reply.

*Id.* at 38. Dolezal responded to Hatfield's email at 10:21 a.m.:

Gary, I think Sue is on this but because there is no mark on the student 24 hours after the incident it is not a Level I investigation. That is the definition of Level I. It still needs to be investigated and I think Sue is on that. Hope this helps.

*Id.*

Dolezal testified that if a level-one investigation does not occur, the District's Human Resources (HR) department completes an investigation. *Id.* at 62. She also clarified, however, that "a mark on the skin after 24 hours" means considering more than just whether A.P.'s face was red 24 hours after he was allegedly slapped:

Q.    But that's not the end of the analysis, is it?

A.    It is for a level one. If there's no – If there's no mark and there's no physical documentation from a doctor that we have a broken arm or a broken jaw, then we would not do a level one. HR is investigating at that point.

Q.    And what effort do you – does the school district engage in to go out and find out if there is additional medical evidence to support an injury beyond just a mark?

A.    Well, typically we will – the parent would provide some of that. They'll say there was – this happened, there was a broken arm, there was whatever.

Q.    Well, sometimes people have a broken arm or something and they don't go to the emergency room right away . . . because they think

it hurts a little bit, it's going to get better . . . and you understand that might happen?

***

A.   Yes . . .

Q.   And you would expect parents in that situation to notify you and say, hey, this incident happened at school and he's – he spent all night with ice on his arm and it's really hurting.  Would that be something you'd take into account?

A.   Yes.

***

Q.   And so if a parent of a student that had recently had brain surgery contacted the school after an incident where one of the school employees had physical contact with a student's head and said he had a seizure last night, he says his head is hurting, we've talked to the – his doctors and they think it may be related to this trauma he suffered the other day, would that be sufficient to trigger a level one?

A.   Yes, it would.

*Id.*

### 2.   *Retaliation*

Barry claims that A.P. was isolated with Hatfield in violation of his IEP, and as retaliation for filing this lawsuit.  Hatfield explained the incident as follows:

Q.   Did you at some point after this incident have [A.P.] alone in your office with just you and excluded . . . his paraprofessional?

A.   Yes.  I wouldn't quite say excluding his para.

Q.    Why did that happen?

A.   Well, there was an incident in the gym where [A.P.] hit – punched his para, Paula, in the face, and she was sent to the clinic in order to get medical treatment.  And then he was brought to my office to talk to me.

16

Q.  And was that the only time that you were alone with him without Ms. Kelly?

A.  There was one other time when he punched Debbie Leeper in the face, and he was brought to my office, and he was with me, oh, on that time probably only about five minutes. He eats lunch with Mrs. Leeper and – while Paula takes her lunch. And so when she came back from lunch, she took him to meet with me.

Doc. No. 42-6 at 14. Hatfield testified that this situation did not violate A.P.'s IEP, because the IEP did not designate a specific paraprofessional and Hatfield can perform that duty when needed. *Id.* Hatfield also testified that he has never discussed the lawsuit with A.P., and that he and A.P. have a generally positive relationship. *Id.* at 15.


# V.    DISCUSSION

Defendants contend that Lane is immune under Iowa law for physical contact with A.P., and that the undisputed facts entitle them to summary judgment on all five of Barry's claims, as well as Barry's request for punitive damages, because Barry cannot prove at least one or more essential element of each claim. Barry resists.


## A.    Lane's Immunity

Defendants first argue that regardless of the type of claim asserted against Lane, she is entitled to blanket liability under Iowa Code § 280.21. They argue that Lane was responding to an ongoing disturbance and commotion where "A.P. had yelled hit, kicked, spit, and unlocked his brakes while being unsecured from the bus, while being moved down the aisle to the loading platform, and while on the platform," and that she was acting in self-defense to protect herself from being spit upon by raising her arm to block spittle. Doc. No. 42 at 14-15. Barry responds that Lane slapping a child's face because she thought she may be spit upon constitutes corporal punishment and that such an action was not reasonable under the circumstances. Doc. No. 47 at 12. Of course, the parties dispute whether Lane's actions were a defensive block or an offensive slap.

Section 280.21 provides, in relevant part:

(1)    An employee of a public school district . . . shall not inflict, or cause to be inflicted, corporal punishment upon a student.  For purposes of this section, "corporal punishment" means the intentional physical punishment of a student.  An employee's physical contact with the body of a student shall not be considered corporal punishment if it is reasonable and necessary under the circumstances and is not designed or intended to cause pain or if the employee uses reasonable force, as defined under section 704.1, for the protection of the employee, the student, or other students; to obtain the possession of a weapon or other dangerous object within a student's control; or the protection of property. . . .

(2)    A school employee who, in the reasonable course of the employee's employment responsibilities, comes into physical contact with a student shall be granted immunity from any civil or criminal liability which might otherwise be incurred or imposed as a result of such physical contact, *if the physical contact is reasonable under the circumstances* and involves the following:

\*\*\*

b.    Protecting the employee, the student, or other students.

\*\*\*

d.    Protecting employee, student, or school property.

e.    Quelling a disturbance or preventing an act threatening physical harm to any person.

f.    Removing a disruptive student from class or any area of the school premises, or from school-sponsored activities off school premises.

g.    Preventing a student from the self-infliction of harm.

h.    Self-defense.

Iowa Code § 280.21(2) (emphasis added).  "'Reasonable force' means that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss."  Iowa Code § 704.1.  "The statute, by its terms, provides a

safe-harbor to shield teachers from liability." *Christiansen v. Iowa Bd. of Educ. Examiners*, 831 N.W.2d 179, 194 (Iowa 2013) (citation omitted).

In this case, there is a clear factual dispute over whether Lane's actions were reasonable. Defendants' argument otherwise – that Barry's statements are nothing more than self-serving allegations that do not create a genuine issue of material fact to outweigh the statements of five other adults – misstates the summary judgment standard. Testimony offered under oath during a deposition is not necessarily a mere "self-serving allegation" simply because it supports the witness's position. If that were the rule, Lane's own deposition testimony could likewise be disregarded as a "self-serving allegation."

Moreover, Barry's deposition testimony is not appropriately viewed in isolation. Barry has also submitted a statement she authored at the time of the incident describing her view of the events and evidence that the investigation into the incident was not thorough. Finally, and most obviously, resolving this disputed fact will largely depend on the assessment of the credibility of each witness. Weighing evidence and making credibility findings not appropriate in considering a motion for summary judgment. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Based on the record before me, and particularly in light of Barry's testimony, the jury could conclude that Lane's conduct was not "reasonable under the circumstances [to] [p]rotect the employee, the student, or other students." Iowa Code § 280.21(2)(b). Of course, the jury could also reach the opposite conclusion. Because this is an issue for the jury, Lane is not entitled to summary judgment based on Iowa Code § 280.21.

## B.    Count 1

Count 1 asserts that Lane violated A.P.'s rights under the Fourth and Fourteenth Amendments by using "unjustified and unreasonable force against him." Defendants argue they are entitled to summary judgment on the Fourth Amendment claim because

(1) the Eighth Circuit does not recognize Fourth Amendment excessive force claims against school officials and (2) no seizure occurred. Defendants argue they are entitled to summary judgment on the Fourteenth Amendment claim because Lane's conduct did not meet the "shocks the conscience" standard required for Fourteenth Amendment Claims. Barry argues that "Lane's actions in yelling, demeaning and physically dominating A.P. by slapping him across the face was both a seizure and unreasonable" in violation of the Fourth Amendment, and that Lane's conduct meets the Fourteenth Amendment "shocks the conscience" standard.

The Eighth Circuit Court of Appeals has recognized both Fourth and Fourteenth Amendment claims arising out of the conduct of school officials in certain circumstances. Specifically, "[a] litigant may state a Fourth Amendment violation by alleging facts which indicate a seizure occurred and that it was unreasonable." *C.N. v. Willmar Public Schools*, 591 F.3d 624, 633 (8th Cir. 2010) (citation omitted). However, the Eighth Circuit "generally analyze[s] claims alleging excessive force by public school officials under the rubric of substantive due process . . . and not the Fourth Amendment." *Id.* at 634 (collecting cases).

### 1.    Fourth Amendment

The Eighth Circuit has established a context-specific reasonableness test for alleged unconstitutional seizures at school:

> Reasonableness is judged in light of the totality of the circumstances, however, and context is therefore critical to reasonableness analysis. And in a school setting, the Fourth Amendment's reasonableness inquiry must account for the schools' custodial and tutelary responsibility over the students entrusted to their care.

*Id.* at 633. A "seizure" within the meaning of the Fourth Amendment involves the willful or intentional application of physical force involving "restraint" on a person's "freedom of movement." *See, e.g. Atkinson v. City of Mt. View*, 709 F.3d 1201, 1208 (8th Cir.

2013); *see also C.N.*, 591 F.3d at 633 (a child was seized under the Fourth Amendment when a teacher placed her in restraints and seclusion).

Barry has failed to generate a material issue of fact as to whether A.P.'s freedom of movement was unreasonably restrained. Her argument to the contrary depends on the fact that A.P.'s wheelchair was locked into the lift and that Lane was scolding him to hold still. Although these facts may technically constitute "restraint" on A.P.'s "freedom of movement," there is absolutely no evidence that these restrictions were unreasonable. The undisputed testimony in the record indicates that A.P. was locked into the lift (and strapped into his wheelchair) for safety as the lift transported him from the bus to the ground. There is no evidence that the purpose of locking A.P. into the lift was to punish him or to segregate him from other students. Instead, it was part of the routine process of moving him from the interior to the exterior of the bus.

The physical contact, even if intentional, did not transform this otherwise-normal part of A.P.'s day into a Fourth Amendment seizure. "The momentary use of physical force by a school employee in reaction to a disruptive or unruly student does not effect a seizure under the Fourth Amendment." *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001). *Gottlieb* involved a student who was pushed backwards into a door. The court stated as follows in explaining the historical distinction between the use of force and a seizure in the context of a school:

> Gottlieb argues that Carbonara's push amounts to a seizure effectuated by a government actor who "by means of physical force or show of authority, . . . in some way restrain[ed] the liberty of a citizen." *Graham*, 490 U.S. at 395 n.10. The Fourth Amendment's prohibition against unreasonable seizures, however, does not properly cover Gottlieb's alleged injury. Courts have recognized that public schools are in a "unique constitutional position," because "[o]nce under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators." *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (students are lawfully subject to a level of restraint that would be unacceptable if "exercised over free adults."). The Fourth Amendment's "principal concern . . . is with intrusions on privacy," and

therefore when the infraction deals not "with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails, but rather with the conditions of ongoing custody following such curtailment of liberty," then the claim invokes principles of substantive due process." *Ingraham*, 430 U.S. at 674 (citation omitted). Gottlieb did not experience the type of detention or physical restraint that we require to effectuate a seizure. . . . Gottlieb's action is a claim of excessive force, not of unreasonable detention.

*Id.* at 171-72.

Barry attempts to distinguish this case from *Gottlieb* by arguing that slapping an 11-year old student with known cognitive, physical and behavioral impairments across the face is more offensive than pushing a high school student backwards into a door. *See* Doc. No. 47 at 16. Although Barry has correctly weighed the reasonableness of the conduct as she alleges it happened, the fact that conduct is not reasonable does not transform it into a Fourth Amendment *seizure*. Because no seizure occurred, the defendants are entitled to summary judgment on the Fourth Amendment claim.

### 2. *Fourteenth Amendment*

Barry's Fourteenth Amendment "substantive due process" claim requires her to prove "(1) that the [defendant(s)] violated one or more fundamental constitutional rights, and (2) that the conduct of the [defendant(s)] was shocking to the 'contemporary conscience.'" *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007). This is "a high standard":

[S]ubstantive due process is concerned with violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience.

*C.N.*, 591 F.3d at 634.[7]

The main point of contention between the parties is whether Lane acted with malice. Barry argues that Lane's malice is evident in the fact that there was no need for Lane to apply any force and that there was evidence Lane was having issues with A.P. Barry makes several factual allegations in support of this conclusion. *See generally* Doc. No. 47 at 17-20. Some are not supported by the summary judgment record.

Barry contends that the most recent pre-slap IEP makes clear that A.P. was having issues with Lane and that Barry had previously complained about Lane being abusive toward A.P. This is not supported by the record. First, the IEP makes no mention of Lane as the source of A.P.'s issues riding the bus. The IEP states simply:

> [A.P.] has had a few issues getting on the bus this past few weeks. The team discussed engaging the bus driver in a token economy system with [A.P.] to help develop their relationship and to help get him on to the bus.

Doc. No. 42-5 at 10. Second, when asked about whether and how she had complained about Lane to the school district, Barry pointed to the IEP. No other school official who was deposed was aware of any problems between Lane and A.P. By contrast, Hatfield testified that A.P. was acting up about going home, rather than having issues with Lane. Doc. No. 42-6 at 21.

---

[7] Barry cites to *Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 564 (8th Cir. 1988) for the proposition that "The Eighth Circuit [has] addressed the question of whether there has been a violation of substantive due process rights by evaluating four factors . . . (1) the need for the application of corporal punishment; (2) the relationship between the need and the amount of punishment administered; (3) the extent of injury inflicted; and (4) whether the punishment was administered in a good faith effort to maintain discipline or malicious and sadistically for the very purpose of causing harm." *See* Doc. No. 47 at 17 (citing *Wise*). Although the fourth element of the *Wise* test is aligned with the test used in *C.N.*, the issue in *Wise* was state-sanctioned corporal punishment that was imposed in accordance with the school's guidelines. This case does not involve a *sanctioned* punishment, as no party contends that slapping A.P. was an appropriate action, and it was not authorized by school guidelines regardless of whether it was intentional.

However, Barry also points to the fact that Lane allegedly believed it would be better for A.P. to be homeschooled and that A.P. was too disabled to go to school as evidence that Lane's actions were malicious or sadistic. Lane acknowledges a conversation with A.P.'s previous paraprofessional that it may be better for him to be homeschooled, although she characterizes the conversation differently. Doc. No. 42-7 at 14. In addition, it is significant that Lane was aware A.P. was recovering from surgery, wheelchair-bound, and lacking impulse control.

Each of these facts can be considered as evidence that Lane's actions were malicious, rather than legitimate or accidental. Indeed, if the jury finds that Lane acted intentionally in slapping A.P., then it could also infer that the conduct was malicious. As such, there is a genuine issue of material fact as to whether Lane acted with malice. The defendants are not entitled to summary judgment on the Fourteenth Amendment claim under Count 1.

## C.    *Count 2 and Count 3*

Counts 2 and 3 allege that the District violated its obligations under Title II of the ADA and under § 504 of the Rehabilitation Act.[8] Specifically, Barry contends that the District failed to ensure that educational services were provided on an equal basis to A.P., that A.P. was subjected to a hostile educational environment, and that the District retaliated against A.P. for pursuing this claim. Doc. No. 1 at ¶¶ 37-47. Defendants argue that, as a matter of law, no reasonable jury could find for Barry on these claims. Barry concedes that she has not discovered evidence in support of a claim for retaliation

---

[8] The Eighth Circuit Court of Appeals has "held that the enforcement, remedies, and rights are the same under both Title II of the ADA and § 504 under the Rehabilitation Act." *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013) (internal quotations omitted). Barry's claims under Count 2 and Count 3 are virtually identical, with the exception that she states a claim for retaliation under Count 2 that she does not state under Count 3. As a result, I will address the Counts together.

(Doc. No. 50 at 23) but resists dismissal of the discrimination and hostile educational environment claims. The retaliation claim in Count 2 will be dismissed.

### 1. *Discrimination on the Basis of Disability*

To establish a claim for disability discrimination, Barry must show (1) that A.P. is disabled, (2) that the District is a place of public accommodation (under the ADA) and that it receives federal funding (under the Rehabilitation Act), and (3) the District discriminated against A.P. on the basis of his disability. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 447 (8th Cir. 2013). The District does not dispute the first two elements. "Discrimination is defined as a failure to 'make reasonable modifications in policies, practices, or procedures' that are 'necessary to afford . . . privileges, advantages, or accommodations to individuals with disabilities' or a failure to 'take such steps as may be necessary to ensure that no individual with a disability is . . . treated differently than other individuals because of the absence of auxiliary aids and services.'" *Id.* (citing 42 U.S.C. § 12182(b)(2)(A)(ii), (iii)).

To establish a claim that the District denied A.P. educational services, Barry must show that the District acted in bad faith or with gross misjudgment by departing substantially from accepted professional judgment, practice or standards, *Estate of Barnwell v. Watson*, 880 F.3d 998, 1004 (8th Cir. 2018), because neither the ADA nor the Rehabilitation Act create general tort liability for educational malpractice. *B.M. ex rel. Miller*, 732 F.3d 882, 887 (8th Cir. 2013).

Barry's complaint outlines the discrimination claim as follows:

[The District] has failed in its responsibilities under Title II *to provide its services, programs and activities* in a full and equal manner to disabled persons as described hereinabove, including failing to ensure that *education services are provided* on an equal basis to children with disabilities and free of hostility.

Doc. No. 1 at ¶ 40 (emphasis added), *see also id.* at ¶ 46 (Rehabilitation Act claim). The complaint does not specify which services were denied to A.P.

The resistance to the motion for summary judgment rewrites the discrimination claim. Barry argues that "[t]he 'gravamen' of A.P.'s ADA and Rehabilitation Act claims is not a denial of a FAPE, *i.e.*, services for disabled children . . . but on subjecting a disabled student to a hostile environment because of his disability." Doc. No. 50 at 21. Barry also characterizes the discriminatory act as Lane's slapping A.P. *because* he was disabled: "Part of A.P.'s disability is a lack of impulse control, including spitting. Lane admitted she made contact with A.P.'s face because she thought he was going to spit on her. . . . A.P.'s disability was the only factor motivating Lane's conduct." *Id.*

Understandably, the District's summary judgment argument addresses the claim as it appears in the complaint (denial of services) rather than the repackaged claim described in Barry's resistance to the motion for summary judgment (A.P. was slapped because of his disability). *See* Doc. No. 42 at 21 (arguing that A.P. was not denied any services because he has had transport to and from school and has advanced in his educational goals). There is no indication in the record that Barry put the District on notice that she intended to change her claim. She did not, for example, seek leave to file an amended complaint to rewrite Counts 2 and 3.

While "the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *Northern States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004); *see also Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). The District has met its burden of showing that it is entitled to summary judgment on the discrimination claims alleged in Counts 2 and 3.

2. *Hostile Educational Environment*

The District contends that it is entitled to summary judgment on the hostile educational environment claim because (1) neither the ADA nor the Rehabilitation Act authorize such a claim and (2) Barry cannot establish that A.P. was harassed because of his disability or that the harassment was sufficiently severe or pervasive such that it altered the conditions of his education and created a hostile educational environment. Barry responds by arguing that both the ADA and Rehabilitation Act authorize a claim for hostile educational environment. However, she does not address the District's argument regarding the pervasiveness or severity of the alleged harassment.

Assuming that a hostile education environment claim can be brought against the District,[9] the District is correct that Barry has failed as a matter of law to establish such a claim. In the employment context, claims of hostile environment based on disability and based on sex discrimination are evaluated in the same way:

> "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted). This means that '[t]he 'unlawful . . . practice' . . . cannot be said to occur on any particular day.

[9] Both parties cite *M.P. ex rel. K. and D.P. v. Ind. Sch. Dist. No. 721*, 439 F.3d 865 (8th Cir. 2006) for the proposition that a claim for hostile educational environment discrimination against a school does or does not exist. The parties read too much into the decision, which states only that a claim for *failure to investigate* allegations of abuse against a student with disabilities, which included an allegation that the student was subject to a hostile educational environment, is actionable under the Rehabilitation Act. *Id.* at 868 ("In the case before us, M.P. argues that . . . the School District failed to provide him with accommodations in the educational environment; failed to investigate allegations of disability discrimination, student-against-student harassment, hostile education environment, and disclosure of personal information; and failed to take appropriate and effective remedial measures once notice of his harassment was provided to school authorities. The School District's *alleged failure to protect* M.P. from unlawful discrimination on the basis of his disability is a claim that is wholly unrelated to the IEP process. . . . We therefore hold that M.P. has a right of action for damages under Section 504." (emphasis added)). *M.P.* does not explicitly foreclose a hostile educational environment claim, nor does it endorse such a claim. Rather, it recognizes a claim regarding failure to protect a student from discrimination (including hostile environment discrimination). Ultimately, I do not need to resolve the issue of whether this claim exists in order to resolve the motion for summary judgment.

It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citation omitted).

*Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 920 (8th Cir. 2018). Even if Lane intentionally slapped A.P. because of his disability, this discrete act alone cannot form the basis of a hostile educational environment claim. There is no other evidence in the record that Lane or any other District employee mistreated A.P. on other occasions, or that any mistreatment was so "severe or pervasive" as to affect the conditions of A.P.'s education. The District is entitled to summary judgment on Counts 2 and 3.

### D.    Count 4

Count 4 asserts multiple claims against all defendants for negligence under Iowa law. Barry contends that the defendants owed A.P. a duty to treat him with dignity and respect and to act reasonably and appropriately towards him, including not subjecting him to unwarranted and unnecessary physical force. She also contends the defendants had a duty to refrain from covering up the wrongful acts of others towards A.P. and that the defendants were specifically forewarned that A.P. needed to avoid head trauma. Barry alleges that the defendants breached their duty to A.P. in the following ways:

a.    Negligent supervision of school transport providers;

b.    Negligent investigation of allegations of wrongdoing;

c.    Failing to keep A.P. safe and free from harm;

d.    Failing to act as reasonable transport providers and school administrators;

e.    Inflicting harm upon A.P. by slapping him across the face;

f.    Making false claims and covering up the wrongful acts towards A.P.; and

g.    Retaliating against A.P. for pursuing this claim.

Doc. No. 1 at ¶¶ 46-49. Defendants argue that they are entitled to summary judgment as to each of the alleged breaches. Barry concedes that defendants are entitled to summary judgment on the retaliation claim. *See* Doc. No. 50 at 26.

### 1. *Negligent Supervision*

The Iowa Supreme Court has described the following standard for proving a negligent supervision claim:

> To succeed on a negligent-supervision claim, plaintiffs must demonstrate (1) the employer knew, or in the exercise of the ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct; (2) through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff; and (3) there is some agency relationship between the employee and the defendant employer.

*Bandstra*, 913 N.W.2d at 41. Defendants contend that this claim fails because there is no evidence of *supervision* in the record, let alone negligent supervision.

The lack of any supervisory relationship between Hatfield and Lane does not appear to be seriously disputed.[10] As noted earlier, Lane was supervised by Denny Schreckengast in the transportation department. There is no evidence of the supervision or training that Lane received (or the lack thereof). There is no evidence that Lane had a history of aggressive behavior toward students or that this incident was otherwise foreseeable. Finally, and most importantly, there is no evidence that this incident was connected in any way with the manner in which Lane was supervised. Critically:

> The crux of a negligent-supervision claim is an employer's failure "to exercise ordinary care in supervising the employment relationship so as to

---

[10] In dispute, Barry offers the supposition that Hatfield demonstrated his supervisory authority over Lane when he "asserted his authority over Lane by directing her to leave before the police arrived to investigate the assault." Doc. No. 50 at 24. This only establishes that Hatfield told a bus driver to continue dropping off the remaining students on the bus and that Lane listened, not that Hatfield had any actual supervisory authority over Lane or any other bus driver.

prevent the *foreseeable* misconduct of an employee from causing harm to others." "Conduct that results in harm to a third person is not negligent or reckless unless there is a foreseeable likelihood that harm will result from the conduct."

*Id.* (quoting 27 Am. Jur. 2d *Employment Relationships*, § 885 (2014, emphasis added) and Restatement (Third) of Agency § 7.005 cmt. *d*). To the extent Count 4 states a claim for negligent supervision, it will be dismissed.

### 2. *Negligent Investigation, Making False Claims and Covering up Wrongful Acts*

Defendants Hatfield and Lane contend they are entitled to summary judgment on the negligent investigation and "making false claims and covering up wrongful acts" claims because there is no evidence that they owed a duty to perform an investigation. The District argues it is entitled to summary judgment on these claims because the undisputed evidence shows that it conducted a proper investigation as required under Iowa Administrative Code § 281-102. *See* Doc. No. 42 at 30 ("[L]evel one investigation was not required because the contact was not intentional and because there was no evidence of injury 24 hours after the incident."). In her resistance, Barry does not argue that Hatfield and Lane should be held liable for negligent investigation, so I will treat that claim as having been abandoned.

Regarding the District, the record contains evidence that could support a finding that the investigation was subpar, and possibly in violation of the Iowa Administrative Code. The jury could find that A.P. was demonstrably injured despite the lack of a mark on his face 24 hours after the incident and, therefore, that a level-one investigation was required under Iowa Administrative Code § 281-102. This does not end the analysis, however, as even if the District's investigation was negligent, the record contains no evidence of any resulting harm. "To succeed on a claim for negligence, the plaintiffs must show the existence of a duty to conform to a standard of conduct to protect others,

a failure to conform to that standard, *proximate cause, and damages*." *Bandstra*, 913 N.W.2d at 41 (emphasis added).

In *Bandstra*, the plaintiffs argued that the defendant Church's "failure to investigate" credible allegations of sexual abuse by the pastor "was the proximate cause of their injuries." *Id.* The Iowa Supreme Court noted that "[w]hile the Church indeed owed a duty of care to the plaintiffs," the Church's alleged failure to investigate could not have harmed the plaintiffs. *Id.* The harm occurred before the Church was aware of the abuse, the investigation could not have prevented the abuse, and there was no evidence of harm resulting directly from the Church's investigation. *Id.*

The same is true here. Even if Iowa law required a level-one investigation of this incident, Barry's failure to demonstrate that any harm flowed from the lack of a level-one investigation is fatal to this claim. There is simply no evidence that A.P. was harmed, physically or emotionally, by any alleged negligence, false claims or "covering up" of wrongful acts in the course of the District's investigation. Summary judgment will be granted as to these claims.

### 3. Failing to Keep A.P. Safe, Failing to Act as Reasonable Transport Providers and Administrators, Inflicting Harm upon A.P. by Slapping Him.

Defendants argue that they are entitled to summary judgment on these allegations because Lane's actions were reasonable under the circumstances. For the reasons discussed above with regard to Barry's Fourteenth Amendment claim, Barry has met her burden by producing evidence that generates a jury question as to whether Lane's conduct was reasonable. Thus, I find that Lane is not entitled to summary judgment as to the general negligence claims. Further, it is possible that the District, as Lane's employer, may be held vicariously liable for Lane's negligence. *See Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999) ("The well-established rule is that under the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed

while the employee is acting within the scope of his or her employment."). However, Barry has put no evidence as to what actions of Hatfield were unreasonable as it relates to the alleged slap. Because Hatfield was neither Lane's employer nor her supervisor, he is not vicariously liable for Lane's actions and is entitled to summary judgment on the negligence claims.

## E.    *Count 5*

Count 5 alleges that Lane committed the tort of battery by slapping A.P. Under Iowa law:

> An actor is subject to liability to another for battery if
>
> a.    he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> b.    an offensive contact with the person of the other directly or indirectly results.
>
> It does not require a physical injury. "A bodily contact is offensive if it offends a reasonable sense of personal dignity."

*Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d 385, 388-89 (Iowa 2000) (citing Restatement (Second) of Torts §§ 18(1), 19). Lane argues that she is entitled to summary judgment because the undisputed evidence shows that she did not intend a harmful or offensive contact but, instead, merely intended to block A.P.'s spit. However, my earlier findings demonstrate that there is a disputed issue of material fact as to the battery claim. Summary judgment will be denied.

## F.    *Count 6*

Count 6, which is based on 42 U.S.C. § 1985, alleges that the defendants "have conspired to cover up the assault" by "falsely claiming the slap across the face was unintentional, failing to preserve video/audio of the incident witnessed directly by A.P.'s mother, by directing another school district employee not to discuss the assault with

counsel for Plaintiff, and by retaliating against A.P. for pursuing this claim." Doc. No. 1 at ¶¶ 56-57. Defendants argue they are entitled to summary judgment on this claim because Barry has failed to put forward evidence of the elements of a § 1985 conspiracy claim. The Eighth Circuit Court of Appeals has described the elements of a civil conspiracy claim under § 1985(3):

> [T]he plaintiff must prove:
>
>> that the defendants did (1) conspire (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws [and] that one or more of the conspirators (3) did, or caused to be done, any act in furtherance of the object of [the] conspiracy, whereby another was (4a) injured in his person or property or (4b) deprived of having and exercising any right or privilege of a citizen of the United States.
>
> *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971) (quoting 42 U.S.C. § 1985(3)). The "purpose" element of the conspiracy requires that the plaintiff prove a class-based "invidiously discriminatory animus." *Id.* at 102 & n. 10. Moreover, the plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement. *Gometz v. Culwell*, 850 F.2d 461, 464 (8th Cir. 1988). She can satisfy this burden by "point[ing] to at least some facts which would suggest that appellees 'reached an understanding' to violate [her] rights." *Nelson v. City of McGehee*, 876 F.2d 56, 59 (8th Cir. 1989) (quoting *Myers v. Morris*, 810 F.2D 1437, 1454 (8th Cir. 1987), *cert. denied*, 484 U.S. 828 (1988).

*City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989) (cleaned up).

Regarding the District, this claim must be dismissed under the intra-corporate immunity doctrine. Under that doctrine, a corporation cannot conspire with its own agents or employees to commit a tort. As the Supreme Court has explained:

> The rule is derived from the nature of the conspiracy prohibition. Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons. When two

persons of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to the principal. And it then follows that there has not been an agreement between two or more separate people.

*Ziglar v. Abassi*, 137 S. Ct. 1843, 1867 (2017) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-71 (1984)); *see also Johnson v. Vilsack*, 833 F.3d 948, 958-59 (8th Cir. 2016); *Kelly v. City of Omaha*, 813 F.3d 1070, 1078 (8th Cir. 2016). Barry has not presented any argument as to why the intra-corporate immunity doctrine does not apply to the District. I find that it does, and that the District is therefore entitled to summary judgment on this claim.

Regarding the individual defendants, the primary dispute between the parties is whether Barry has put forth material facts demonstrating that the defendants reached an agreement to violate A.P.'s constitutional rights. Barry argues that an agreement can be demonstrated through an email sent by Hatfield and the responses received, as discussed above. Barry states:

> Hatfield wrote an email suggesting a meeting where the School District could get its facts straight. Within an hour and a half the meeting was held and a decision was made to ignore Iowa law on the investigation of abuse complaints and not investigate whether Lane acted intentionally by pre-determining that she did not. In making that decision any information disputing the outcome was not considered, including the witness statements of Barry and Kelly, and the audio/video of the incident which allegedly "never took."

Doc. No. 50 at 27-28. This statement mischaracterizes the evidence. First, the email at issue from Hatfield suggested a meeting "to make sure we are investigating and reacting properly." Doc. No. 47-3 at 37. Hatfield acknowledged that he could not lead an investigation as a witness to the incident and suggested a list of people who may have something to contribute to any potential investigation. Hatfield did not suggest that the parties needed to "get [their] facts straight."

Second, Barry's allegation that "[w]ithin an hour and a half the meeting was held" is not supported by any facts in the record. Rather, the evidence shows that the email

was responded to within an hour-and-a-half by District employees updating Hatfield on the status of the investigation. *Id.* at 38-39. Completing an investigation – even if the investigation could have been more thorough – is not material evidence of an agreement to cover up a violation of A.P.'s rights. There is no evidence that any witnesses were told to lie about what they observed on the bus or were prevented from providing evidence to the District, to the Cedar Rapids Police Department or to the parties in this case. Because Barry has not put forth evidence of an agreement, this claim fails. Defendants are entitled to summary judgment as to Count 6.

## G.    *Punitive Damages*

Finally, defendants claim they are entitled to summary judgment on Barry's request for punitive damages. Barry requests punitive damages against both Lane and Hatfield, but not against the District. Based on my earlier findings, Barry is entitled to request punitive damages against Lane. The Iowa Supreme Court has explained that

> punitive damages "serve as a form of punishment and to deter others from conduct which is sufficiently egregious to call for the remedy." *McClure*, 613 N.W.2d at 230. Consequently, punitive damages are appropriate only when actual or legal malice is shown. Mere negligent conduct is therefore not sufficient to support a claim for punitive damages.

*Mercer v. Pittway Corp.*, 616 N.W.2d 602, 617 (Iowa 2000) (cleaned up). Because Barry is pursuing a claim against Lane for battery, it is clearly appropriate to put the issue of punitive damages before the jury. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 396 n.2 ("In committing the battery, [the defendant] committed a wrongful act which necessarily entailed willful and reckless disregard for another's rights. The commission of a battery, however, merely allows, but does not mandate, the award of punitive damages." (citation omitted)).

However, Hatfield was only named as a defendant in Counts 4 (negligence) and 6 (civil conspiracy). Because I am granting summary judgment in Hatfield's favor on both counts, he will not be subject to punitive damages.

## VI.    CONCLUSION

For the foregoing reasons, Defendants motion (Doc. No. 35) for summary judgment is **granted in part** and **denied in part**, as follows:

1.    As to defendant Hatfield: **granted**.  All claims against Hatfield are dismissed and he is dismissed as a defendant to this case.

2.    As to Count 1: **granted in part** and **denied in part.**  The Fourth Amendment claim is dismissed.  The Fourteenth Amendment claim will proceed to trial against defendant Lane.

3.    As to Counts 2 and 3: **granted**.  These claims are dismissed.

4.    As to Count 4: **granted in part** and **denied in part**.  The claims related to negligent supervision, investigation and retaliation are dismissed.  The claims alleging general negligence against Lane and the District will proceed to trial.

5.    As to Count 5: **denied.**  The claim for battery against Lane will proceed to trial.

6.    As to Count 6: **granted.**  The claim for civil conspiracy against all defendants is dismissed.

7.    As to the request for punitive damages: **granted in part** and **denied in part**.  Plaintiff is entitled to submit the issue of punitive damages against Lane to the jury.  As all claims have been dismissed against Hatfield, no claim for punitive damages can remain against him.

This case will proceed to trial as scheduled with regard to the surviving counts.

**IT IS SO ORDERED.**

**DATED** this 15th day of March, 2019.

_____
Leonard T. Strand, Chief Judge